MONIQUE C. WINKLER (Cal. Bar No. 213031)
 winklerm@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
 leejh@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
 katzma@sec.gov
SHEILA O'CALLAGHAN (Cal. Bar No. 131032)
 ocallaghans@sec.gov
BERNARD B. SMYTH (Cal. Bar No. 217741)
 smythb@sec.gov
ELI R. GREENSTEIN (Cal. Bar No. 217945)
 greensteine@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ALEXANDER C. BECKMAN and VALERIE H. LAU, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY OF THE ACTION

1.     From at least 2019 through 2024, Defendant Alexander Beckman engaged in a fraudulent scheme to mislead investors and raise more than $60 million by falsely inflating the financial performance and commercial success of The ON Platform Inc., f/k/a GameOn Inc.

("GameOn"), a San Francisco-based AI chat startup company. Beckman co-founded GameOn and was its CEO and a member of its Board of Directors ("Board") until his resignation from both positions on July 1, 2024. In connection with GameOn's securities offerings, Beckman made false and misleading statements to investors that grossly inflated the company's financial performance. Beckman falsely represented to investors that GameOn had generated tens of millions of dollars in annual revenue and positive net income from dozens of contracts with high-profile customers. But in reality, GameOn's annual revenue never exceeded $500,000, the company was never profitable, and GameOn was losing millions of dollars every year. In addition, Beckman repeatedly provided investors with fictitious company balance sheets reflecting millions of dollars in cash when the true cash position was a tiny fraction of what was represented—and at times close to zero.

2.      Defendant Valerie Lau is a California attorney who married Beckman on or around October 30, 2023. Lau participated in the deceptive scheme by, among other things, helping Beckman create and disseminate a fake audit report with the logo and signature of a prominent "Big Four" accounting firm, PricewaterhouseCoopers LLP ("PwC"). Despite knowing that PwC had never performed any audit for GameOn, Lau and Beckman sent this fake audit report to multiple investors and their representatives while Beckman was trying to induce them to purchase GameOn's securities.

3.      Beckman also provided investors with fictitious customer revenue reports reflecting millions of dollars in recurring revenue from dozens of high-profile customers, including national sports leagues such as the National Basketball Association ("NBA"), National Hockey League ("NHL"), and Professional Golfers' Association ("PGA") as well as prominent brands like Coca-Cola. In reality, GameOn was generating very little (if any) revenue from many of these supposed top customers and was instead paying those entities significant fees for using their branded content. Some of the largest purported customers, to which Beckman attributed millions of dollars in revenue, had no contracts with GameOn at all. In other cases, GameOn was simply conducting pilot programs for free or in exchange for nominal subscription fees.

4.     Beckman also sent multiple investors fake bank statements that falsely showed millions of dollars in cash on hand and fictitious payments to GameOn from supposedly key customers. Numerous investors, including individuals, institutions, and venture funds, purchased GameOn's securities after receiving false financial records.

5.     In an apparent attempt to help perpetuate this fraud and conceal GameOn's true financial status, Beckman created fake email accounts impersonating several of GameOn's financial consultants and bankers and used those fictitious accounts to send false financial information to GameOn's Board and investors. Additionally, when the company's Board demanded that Beckman provide proof of the company's true cash position, Lau helped Beckman disseminate to the Board and investors a fake bank statement that dramatically misrepresented GameOn's true cash position.

6.     The scheme unraveled in early July 2024 when GameOn's Board obtained access to the company's actual bank accounts and determined that prior financial statements that Beckman provided were false and that the company had insufficient funds to pay its employees. Beckman subsequently resigned under pressure from the Board, and GameOn laid off nearly all of its employees. On July 11, 2024, the company's senior officers sent an email to GameOn's shareholders stating that GameOn's prior financial statements were false and could no longer be relied upon. The email explained that Beckman had misrepresented GameOn's financial performance and operations and "used elaborate lies and deception" to mislead the Board and investors about the company's finances.

7.     As a result of the conduct alleged in this Complaint, Beckman and Lau (together, "Defendants") violated antifraud provisions of the federal securities laws. Specifically, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Beckman violated Sections 17(a)(1) through (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1)-(3)], and Lau violated Sections 17(a)(1) and (3) of the Securities Act.

## JURISDICTION AND VENUE

8.      The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Defendants, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

11.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District. Defendants met with and/or solicited prospective investors in this District, and offers and sales of securities took place in this District.

12.     Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division because a substantial part of the acts and transactions constituting the alleged violations occurred in San Francisco and Defendants reside in San Francisco.

## DEFENDANTS

13.     **Alexander Beckman**, age 41, is a resident of San Francisco, California. Beckman co-founded GameOn and was its Chief Executive Officer and a Board member until July 1, 2024.

14.     **Valerie Lau**, age 38, is a resident of San Francisco, California. While not an official GameOn employee, Lau had a GameOn company email address and frequently performed tasks purportedly on behalf of GameOn, including communicating directly with investors. Lau is an attorney licensed to practice law in California since 2015 and worked as the General Counsel of a venture capital firm. Beckman and Lau were married on or about October 30, 2023.

## RELATED ENTITY

15.     **The ON Platform Inc. f/k/a GameOn Inc.** is a Delaware corporation with its principal place of business in San Francisco, California. From 2014 to approximately December 2023, the company operated under the name "GameOn Inc." In December 2023, the company changed its name to "The ON Platform Inc."

## FACTUAL ALLEGATIONS

### I.     GameOn's History and Fundraising.

16.     Beckman co-founded GameOn in 2014 and was the company's CEO and a Board member until he resigned in July 2024. The company's stated mission was to provide an "industry-leading intelligent chat platform that powers authentic conversational experiences for some of the world's largest and most popular brands, teams and content properties."

17.     For most of its history, GameOn operated without a CFO. From at least 2019 through Beckman's resignation in July 2024, Beckman was responsible for the preparation of GameOn's financial statements that were distributed to investors, including balance sheets, income statements, cash flow statements, and customer revenue reports. Beckman also was one of the few signatories for the company's bank and financial accounts and authorized and/or supervised the wiring and transfer of funds in and out of those accounts.

18.     Both Beckman and Lau were involved in GameOn's fundraising efforts from at least 2019 through June 2024. Beckman led the fundraising efforts and communicated with potential investors through email, phone calls, video conferences, text messages, and in-person meetings. Lau frequently communicated with potential investors, primarily through email.

19.     Between 2019 and 2024, GameOn raised more than $60 million from a variety of institutional, venture capital, and individual investors. Throughout this period, GameOn was frequently in financial distress, routinely received overdraft notices from its banks, and regularly failed to generate enough cash to pay its operational expenses.

**II.   Beckman Misrepresented GameOn's Financial Condition and Performance to Investors, and Beckman and Lau Provided Investors with Fake Audit Reports.**

20.     Between 2019 and 2024, when soliciting investments in GameOn's securities, Beckman made numerous false and misleading statements and provided investors with false documentation concerning GameOn's financial condition and performance. This false information included annual and quarterly financial statements showing inflated revenue, net income, cash, and customer-by-customer revenue. Beckman also provided investors with fake audit reports, purportedly prepared by two large audit firms, PwC and Moss Adams LLP ("Moss Adams"). Beckman created the fictitious audit reports using sample audit reports that Lau provided from unrelated companies. The fake audit reports contained "unqualified" audit opinions regarding GameOn's inflated financials. Lau sent the fake PwC audit report to an investor's representative and was copied on multiple communications that Beckman sent to investors attaching both fake audit reports purportedly from PwC and Moss Adams. Beckman also sent multiple investors forged bank records showing significant revenue flowing into GameOn's bank accounts from key customers that never actually paid GameOn those funds. Additionally, Beckman created fake email accounts impersonating certain of GameOn's financial consultants and bankers, which he used to send false financial information to investors and GameOn's Board.

**A.   Beckman Misrepresented GameOn's Revenue and Net Income.**

21.     In connection with GameOn's offerings from at least 2019 through June 2024, Beckman prepared and provided fictitious financial statements to numerous prospective investors. These false financial statements purported to show tens of millions of dollars in annual revenue and, in many instances, millions of dollars of net income. Among other things, they included quarterly and annual financial statements purporting to reflect annual revenue of approximately $12.2 million in 2019, $12 million in 2020, $31.7 million in 2021, $68.6 million in 2022, and $100.6 million in 2023.

22.     For example, on February 24, 2020, Beckman sent false financial statements to a prospective investor ("Investor 1") representing that GameOn had generated approximately

$12.2 million in revenue and over $4.2 million in net income in 2019. Investor 1 subsequently invested approximately $2 million in the company.

23.    On May 19, 2021, Beckman sent another investor ("Investor 2") financial statements representing that GameOn generated approximately $11.9 million in revenue in 2020, and approximately $10.9 million in revenue and $1.2 million in net income in 2021 (as of May 15, 2021). Investor 2 subsequently invested more than $5 million in the company.

24.    In October and November 2021, Beckman sent an additional investor ("Investor 3") financial statements representing that GameOn had generated annual recurring revenue of approximately $23.5 million as of October 2021 (including $15.75 million in advertising revenue), and that a total of $32.3 million was expected by the end of December 2021. Investor 3 subsequently invested approximately $2.25 million in the company. In June 2022, Beckman sent Investor 3 additional financial statements representing that GameOn generated revenue of approximately $31.7 million in 2021 and $15.8 million in the first quarter of 2022. The financials also represented that the company had been profitable for three consecutive years. Investor 3 subsequently invested another $100,000 in the company.

25.    In March 2023, Beckman sent another investor ("Investor 4") financial statements reflecting revenue of approximately $31.7 million in 2021 and $68.6 million in 2022. The investor subsequently invested approximately $1.5 million in the company.

26.    In June 2023, Beckman sent an additional investor ("Investor 5") financials showing revenue of approximately $31.7 million in 2021, $68.6 million in 2022, and $21.8 million in the first quarter of 2023. Investor 5 subsequently invested approximately $3 million in the company.

27.    In January 2024, Beckman sent another investor ("Investor 6") financials showing revenue of $31.7 million in 2021 and $68.6 million in 2022 (identified as "gross sales" in 2022). Investor 6 subsequently invested approximately $3.1 million in the company.

28.    These representations, and many other identical financial statements that Beckman sent to investors from 2019 through 2024, were false. According to internal company financial records, including bank records and financial analyses, as well as financial statements

prepared by a financial consultant that GameOn hired in November 2023 to serve as a "Fractional CFO" ("Financial Consultant 1"), the company never generated more than $500,000 in annual revenue. Additionally, GameOn never generated advertising revenue and the company lost millions of dollars each year. In fact, GameOn routinely struggled to pay operating expenses and payroll, and continued operating by raising additional funds from investors.

29.     Beckman knew, or was reckless in not knowing, that the financial representations he made to investors between 2019 and 2024 were false. He controlled GameOn's financial and bank accounts which showed that the company's true revenue and cash levels were far lower than represented. Beckman also received the company's internal financial records, including financial analyses prepared by another financial consultant that GameOn hired prior to 2020 ("Financial Consultant 2"). For example, on April 10, 2023, Financial Consultant 2 sent Beckman a "Profit and Loss" statement showing that GameOn had net *losses* of approximately $20 million and only $215,000 in *total* revenue during the four years ending December 2021. Likewise, in early December 2023, Financial Consultant 2 sent Beckman another "Profit and Loss" statement for January through October 2023 showing approximately $108,000 in total revenue and net *losses* of approximately $15.7 million.

30.     Beckman's repeated misrepresentations from 2019 through June 2024 regarding GameOn's revenue and net income were important to investors because they created the false impression that GameOn was a rapidly growing and financially stable company.

**B.     Beckman Misrepresented GameOn's Cash Balance.**

31.     From at least 2019 through June 2024, Beckman provided investors with financial statements showing that GameOn had tens of millions of dollars in cash, including millions of dollars in specific operating accounts at large financial and banking firms. For example, in October 2021, Beckman sent Investor 3 financial statements representing that GameOn had a total cash balance of approximately $21.7 million "as of" September 30, 2021. This representation was false. As of September 30, 2021, GameOn's cash balance was approximately $5.4 million.

32.     Similarly, on March 21, 2023, Beckman sent financials to Investor 4 representing that GameOn had a total cash balance of approximately $31.8 million "as of December 31, 2023 [sic]." But GameOn's actual bank statements show that its cash balance on December 31, 2022 was approximately $5.3 million and approximately $1.5 million as of March 21, 2023.

33.     On June 8, 2023, Beckman sent financials to Investor 5 representing that GameOn had a total cash balance of approximately $26 million "as of" March 31, 2023, including $25.7 million in a specific account at a prominent financial and banking firm ("Bank 1"). These representations were false. As of March 31, 2023, GameOn's total cash balance was approximately $917,000, including approximately $593,000 in its account at Bank 1.

34.     On March 4, 2024, Beckman sent Investor 5 financials representing that GameOn had a total cash balance of approximately $29.4 million "as of" December 31, 2023, including approximately $15 million in its account at Bank 1. These representations were false. As of December 31, 2023, GameOn's true cash balance was approximately $112,000—far lower than Beckman represented—including $0 in its account at Bank 1.

35.     From 2019 to July 2024 when Beckman was forced to resign, GameOn's actual total year-end cash balance never exceeded approximately $7.5 million and had steadily declined from approximately $7.5 million at the end of 2021, to $5.3 million at the end of 2022, and then $112,000 by the end of 2023. At the time of Beckman's resignation, GameOn's cash balance was approximately $665,000. Also, from late February 2020 to December 2022, the company's cash balance at Bank 1 never exceeded more than approximately $2,700. Although the Bank 1 balance sporadically increased for short periods in 2023 and 2024 (primarily due to new investor funds), by the end of 2023 the balance was $0, and at the end of June 2024 the balance was $0.37. When GameOn's Board accessed the company's true financial records in July 2024, they informed GameOn's investors that the company only had approximately $550,000 in total cash as of July 8, 2024, including $0.37 in its account at Bank 1.

36.     Beckman knew, or was reckless in not knowing, that the information about GameOn's cash balance he provided to investors was false. Beckman was one of the few GameOn employees to have access to the company's bank and financial accounts, including the

account at Bank 1. In addition, from approximately 2019 to June 2024, Beckman received numerous communications, including bank overdraft notices and past due invoices, showing that GameOn was in financial distress, had overdrawn its bank accounts, and struggled to pay its regular operating expenses.

37.    Beckman's misrepresentations from 2019 through June 2024 regarding GameOn's cash balance were important to investors because they presented the company as financially sound and even profitable when it was frequently in a state of financial distress and struggled to pay operating expenses.

**C.    Beckman and Lau Misled Investors With Fake Audit Reports.**

38.    From approximately June 2022 to 2024, Beckman, with Lau's assistance, created and disseminated fake audit reports purportedly issued by two prominent audit firms, PwC and Moss Adams. The audit reports included "unqualified" or "clean" audit opinions regarding GameOn's grossly inflated 2021 and 2022 financial statements. But neither firm ever audited GameOn and the financial statements referenced in the fake reports were false as well.

39.    On June 20, 2022, Lau sent Beckman an email attaching a "sample" Moss Adams audit report for an unrelated company. The sample audit report included a watermark from Lau's employer, a venture capital firm. The next day, June 21, 2022, Beckman emailed a fake Moss Adams audit report to GameOn's Board regarding the company's 2021 financial results. Several GameOn investors, including Investor 1, Investor 2, Investor 4, and one of GameOn's early investors ("Investor 7"), sat on the GameOn Board and received the fake Moss Adams report. Beckman's cover email represented that the Moss Adams report was "an audit of our Operations and Finances for 2021." The report itself stated that it was a "Report of Independent Auditors and Financial Statements" purportedly issued and signed by Moss Adams on June 16, 2022. The report contained fictitious GameOn financial statements for 2021, including inflated revenue ($31.8 million), cash ($28.2 million), and net income ($750,000). The report also included an "unqualified opinion" regarding GameOn's 2021 financials. Unbeknownst to the Board and its investor members, the report was a forgery and Moss Adams never audited GameOn.

40.     Similar to the sequence of events underlying the fake Moss Adams report a year earlier, on July 27, 2023, Lau sent Beckman a "sample audit" report from PwC for an unrelated insurance company. The next day, July 28, 2023, Lau emailed Beckman a draft email addressed to GameOn's Board and its investor members stating that the company's 2021 financial statements had been audited by Moss Adams. The draft email also stated that another audit firm, whose name was left blank, had already commenced an audit of GameOn's 2022 financials which would be completed within 60 days. Later that day, Beckman sent an email to GameOn's Board and its investor members falsely representing that "we have started the process of auditing our 2022 financials," "we used Moss Adams for 2021 and are using PwC for last year," and that he "expect[ed] the audit to be done in 60 days" because "the first one [Moss Adams] took a little over 60 days from start to finish." Additionally, according to minutes of a July 31, 2023 GameOn Board meeting, Beckman "reported that the company has engaged PwC to audit the Company's 2022 financial statements, and PwC has commenced its work on the audit." Beckman subsequently forwarded his July 28, 2023 Board email to Lau on August 4, 2023.

41.     On October 23, 2023, Beckman sent Lau a fake PwC audit report based on the prior sample she provided, stating "attached please take look." Beckman also forwarded Lau her prior July 2023 email to him attaching the "sample" PwC audit report for the unrelated insurance company. A few hours later, Beckman sent an email to GameOn's Board (which at the time included Investors 1, 2, 4, 6, and 7 as Board members or observers) attaching the fake PwC audit report concerning GameOn's 2022 financials. Beckman's October 23, 2023 email—which blind copied Lau—stated that the PwC report was "the report of our 2022 audit." This fake PwC report largely mirrored the sample that Lau provided Beckman in July 2023 but changed the date (from May 1, 2023 to October 16, 2023) and inserted fictitious financials and other information specific to GameOn. The fraudulent report also included a forged PwC signature and an "unqualified" opinion regarding GameOn's purported 2022 financials, including inflated revenue ($32.4 million) and cash ($31.8 million), as well as understated net losses (-$350,480). The referenced financials, like the report itself, were fabricated.

42.     On December 7, 2023, Investor 4, one of GameOn's largest investors who sat on the Board, emailed Beckman questions about apparent discrepancies between the PwC report and other financial information that Beckman previously circulated, including whether PwC had approved GameOn's revenue recognition practices. Beckman falsely responded, "[w]hat we have done so far, according to PwC is fine."

43.     On March 19, 2024, another investor ("Investor 8") and his representative emailed Beckman and Lau requesting "audited financials" in connection with a new investment. Later that day, Lau emailed the fake PwC audit report to the prospective investor's representative, falsely stating "please find attached the latest audited financials" and "[w]e would of course appreciate if these were kept confidential." The investor later invested $100,000 in the company. Over the course of the next few months, Beckman continued to send the fake PwC and Moss Adams audit reports to prospective investors, copying Lau on several of those emails. Lau never corrected the falsely disseminated information regarding the fake PwC audit report, despite knowing that PwC had never audited GameOn and that the report was a forgery.

44.     Defendants' statements to investors concerning purported audits of GameOn's financials were false. GameOn's financials had never been audited by Moss Adams or PwC. Beckman knew, or was reckless in not knowing, that GameOn had never hired those audit firms and that the audit reports were forgeries. Regarding Moss Adams, Beckman never engaged the firm in any capacity. He simply modified the Moss Adams report that Lau provided for an unrelated company.

45.     Additionally, Beckman and Lau both knew, or were reckless in not knowing, that GameOn had never hired PwC. They had merely set up introductory calls with PwC in September and October 2023 to inquire about a *potential* audit engagement—which never happened. Yet Beckman had already made false statements about the PwC audit in July 2023 and distributed the fake PwC audit report to GameOn's Board and investors in October 2023, copying Lau. When PwC followed up with an initial "proposal" in November 2023 and requested certain financial information, Beckman and Lau failed to substantively respond and GameOn never retained PwC in any capacity. Thus, at the time Beckman and Lau sent the

purported PwC audit report to investors, they knew, or were reckless in not knowing, that the report circulated to those investors was fake.

46.     Defendants' misrepresentations regarding the purported audits of GameOn's financials, and the provision of the fake audit reports to investors, were important to investors because the fake audit reports provided false assurances that GameOn's grossly inflated financials were genuine and accurate.

**D.    Beckman Misled Investors Regarding GameOn's Customer Contracts and Revenue.**

47.     Beckman repeatedly made misrepresentations and provided false documentation to investors concerning GameOn's customer contracts and associated revenue. For example, on June 8, 2023, Beckman sent Investor 5 a detailed financial report that included historical revenue for each of GameOn's purported major customers, including the NBA, NHL, and PGA, as well as numerous other professional sports teams, fashion brands, and public companies. The report represented that GameOn had generated $21.8 million in quarterly revenue from over 35 customers in 1Q23 (ending March 31, 2023), including millions of dollars in advertising revenue. The report also specifically represented that certain high-profile contracts had generated millions of dollars in total revenue, with approximately $15 million from the NBA, $2.15 million from the NHL, $2.3 million from the PGA, and $3.2 million from Coca-Cola. Shortly after receiving this report, Investor 5 made a $3 million investment in GameOn's securities.

48.     Similarly, on December 11, 2023, Beckman sent an updated customer revenue report to one of GameOn's largest investors (Investor 4) showing $26.2 million in customer revenue for 3Q23 (ending September 30, 2023), including millions of dollars in revenue from the NBA, NHL, PGA, and Coca-Cola, among others. When Investor 4 later asked for documentation evidencing the customer revenue payments and the associated contracts in June 2024, Beckman created and sent Investor 4 an electronic folder of fake contract summaries showing fictitious amounts and categories of revenue for numerous individual customers.

49.     These representations concerning customer revenue and contracts, and other similar representations made to investors about customer revenue, were false. GameOn never

1  generated more than $500,000 in annual revenue for the entire company, let alone millions of

2  dollars from specific contracts. Many of GameOn's contracts with large customers, including the

3  NBA, NHL, and PGA, not only failed to generate the revenue that Beckman represented but

4  instead required GameOn to *pay* significant fees to license and use the customers' brands and

5  related content in GameOn's product. For example, GameOn's contract with the NBA required

6  GameOn to pay over $5 million in licensing fees (more than $1 million per year), which was

7  more than GameOn's entire company revenue stream. Similarly, GameOn's contract with the

8  NHL required GameOn to pay approximately $2 million in licensing fees over three years, and

9  GameOn's contract with the PGA required GameOn to pay more than $1 million in licensing

10  fees over two years. Additionally, some of the purported contracts with large companies that

11  Beckman touted to investors—such as the alleged contract with Coca-Cola—did not exist. Many

12  other contracts with prominent customers were merely pilot programs that generated no revenue.

13  Further, Beckman's statements about generating millions of dollars of advertising revenue were

14  false, as GameOn never generated revenue from advertising.

15       50.    Beckman knew, or was reckless in not knowing, that GameOn had not generated

16  more than $500,000 in total revenue in any given year—let alone millions of dollars in revenue

17  from customers like the NBA, NHL, and PGA—and that GameOn did not have contracts with

18  certain large purported customers like Coca-Cola. Beckman negotiated, signed, and/or approved

19  the company's major contracts and controlled GameOn's financial and bank accounts. Beckman

20  also knew, or was reckless in not knowing, that many of GameOn's contracts with key

21  customers required GameOn to pay significant fees to those customers rather than the other way

22  around. Indeed, Beckman frequently communicated with those customers about the true

23  financial arrangements, including GameOn's repeated failure to pay contractual fees. For

24  example, the NBA, NHL, and PGA repeatedly emailed Beckman regarding GameOn's failure to

25  pay significant fees under their contracts. At the time of Beckman's resignation in July 2024, the

26  NBA was still owed approximately $1.1 million in unpaid fees and the NHL was still seeking

27  approximately $1.125 million in past due invoices dating back to March 2020.

28

51.     In an apparent attempt to conceal his misrepresentations regarding GameOn's customer contracts from investors, Beckman created counterfeit bank account statements that he sent to GameOn's Board and multiple investors showing that major customers like the NBA had paid GameOn millions of dollars. For example, on June 27, 2023, in response to a request from Investor 5 for bank statements showing receipt of $3.28 million in purported revenue from GameOn's NBA contract, Beckman sent a forged bank statement showing a fictitious $3.28 million wire from the NBA to GameOn's account in March 2023 that never occurred. Similarly, on July 18, 2023, Beckman sent an email to Investor 7 attaching fake account statements from two different banks showing millions of dollars in fictitious wire transfers from many large customers, including the NBA, NHL, and PGA.

52.     Beckman's misrepresentations regarding GameOn's customer contracts and associated revenue were important to investors because they created a false picture that GameOn had booked numerous high-profile customer contracts that generated millions of dollars in revenue for the company.

**E.      Beckman and Lau Engaged in Additional Deceptive Conduct to Cover Up the Fraud and Conceal the Truth From Investors.**

53.     In November 2023, GameOn hired Financial Consultant 1 to review and reconcile the company's financial information. In May 2024, following months of analysis, the consultant raised a number of questions and financial irregularities to GameOn's Board. The Board then held a special meeting and, on May 26, 2024, sent Beckman an email demanding that he provide detailed information supporting the company's financial statements and cash position, including account statements from Bank 1 and details concerning the purported PwC audit. In response to these inquiries, Beckman engaged in an elaborate series of lies and deceitful conduct. Beckman impersonated multiple Bank 1 employees and both of GameOn's financial consultants, and Beckman and Lau worked together to present a forged account statement from Bank 1 to a GameOn Board member and investor (Investor 2) who had demanded that Beckman provide proof of GameOn's cash balance.

54.     For example, on May 30, 2024—a few days after the Board demanded that Beckman provide proof supporting his representations regarding the PwC audit and GameOn's financial position—Beckman created a fake GameOn email address impersonating an employee of Financial Consultant 2. That same day, Beckman used the fake email address to send fictitious financial statements to a Board member (Investor 4), in an apparent attempt to create the false impression that the consultant had reviewed and approved GameOn's inflated financials. Beckman also used the fictitious email address to create a fake email exchange between the consultant and himself, making it look like the consultant prepared the false financials and sent them to Beckman. Beckman then forwarded the fabricated exchange to Investor 4. Following receipt of this fictitious email exchange in May 2024, Investor 4 asked Beckman for the consultant's phone number to verify the financial information that Beckman provided using the fake email account. Investor 4 later reported to the Board that when he called the phone number Beckman provided, the person that answered the call sounded like a disguised version of Beckman's voice.

55.     Beckman also created fake email accounts impersonating Bank 1 employees assigned to GameOn's account to deceive GameOn's Board and investors into believing that there were millions of dollars in the Bank 1 account, when it was actually nearly empty. In April and May 2024, Beckman used fictitious Bank 1 email addresses to communicate false information to Financial Consultant 1 and another senior GameOn executive who were attempting to access GameOn's funds and reconcile its cash position on behalf of the Board and its investor directors. The fake email addresses used a slight variation of Bank 1's real email address domain. One of the fictitious email exchanges purporting to be from Bank 1 made up false excuses for why GameOn could not access its funds, including that millions of dollars were locked up in Certificates of Deposit that could not immediately be liquidated. Another fake email exchange created a ruse about Bank 1 conducting an internal investigation of potential misconduct by one of the employees servicing GameOn's account, which supposedly delayed Bank 1's ability to release GameOn's funds. Beckman used these fake email exchanges to

1    mislead GameOn's Board and its investor directors about GameOn's true cash position and its

2    inability to access funds.

3        56.    Beckman and Lau also engaged in an elaborate scheme to deceive a GameOn

4    Board member into believing that the company had $13.3 million in its Bank 1 account when the

5    balance was close to $0. On June 3, 2024, security camera footage from a Bank 1 branch near

6    GameOn's offices in San Francisco captured the image of a woman who appears to be Lau enter

7    the bank and meet with a Bank 1 employee. The woman then requested that the bank employee,

8    who did not have access to GameOn's accounts, print out a paper copy of a Bank 1 account

9    statement for GameOn that she planned to email the bank—and then give the statement to

10   Beckman when he arrived at the bank later that day. A few hours later on June 3, 2024, Lau

11   emailed the bank employee stating "please print, thank you" and attaching a counterfeit Bank 1

12   statement showing a cash balance of $13.3 million in GameOn's account as of May 31, 2024. As

13   Lau requested, the bank employee printed out the statement and put it in an envelope for

14   Beckman. Later that same day, Beckman arrived at the bank accompanied by a GameOn Board

15   member (Investor 2) who was there to verify the cash in GameOn's Bank 1 account. The bank

16   employee gave the envelope containing the counterfeit account statement to Beckman who then

17   handed the envelope to the Board member and exited the bank. The Board member subsequently

18   provided the fake Bank 1 account statement showing a $13.3 million balance to GameOn's

19   entire Board of Directors.

20       57.    Two days earlier, on June 1, 2024, Beckman had emailed himself a copy of

21   GameOn's *actual* Bank 1 statement for April 2024 showing a $0 balance as of April 30, 2024.

22   And the company's true Bank 1 statement for May 2024 showed an ending balance of $25.93.

23       **F.  Beckman and Lau Used GameOn's Money for Their Personal Benefit.**

24       58.    Beckman and Lau regularly used GameOn's money to pay for personal expenses.

25   For example, in April 2022, Beckman, with Lau's knowledge, transferred millions of dollars

26   from GameOn's bank account to Beckman and Lau's personal joint account to fund the purchase

27   of a $4.25 million house. Also, in June 2024, Beckman used GameOn company funds to pay his

28   employees at another, unrelated company that he managed. Additionally, between approximately

2019 and 2024, Beckman used GameOn's money to pay personal credit card bills and make payments for personal expenses, including, among other things, private school donations, car payments, a luxury watch, and other jewelry and designer store purchases. Likewise, between approximately 2021 and 2024, Lau used GameOn's money to pay her personal credit card bills.

### III.    The Scheme Unravels and GameOn's Board Forces Beckman to Resign.

59.    On July 11, 2024, following months of investigation by Financial Consultant 1 and GameOn's Board, the company's interim co-Presidents sent an email to GameOn's investors stating that the Board had determined that the company's prior financial statements were false and could no longer be relied upon. The email further stated that Beckman had, among other things, made "abjectly false" statements about GameOn's finances and operations and "used elaborate lies and deception" to mislead the Board about the company's cash levels. Additionally, the email noted that, contrary to Beckman's representations that the company had over $10 million in one of its financial accounts, the true account balance was only $0.37. The email also announced that Beckman had resigned on July 1, 2024 and that due to GameOn's cash crisis, the company was forced to lay off nearly all of its 60 employees.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder Against Defendants Beckman and Lau

60.    The SEC realleges and incorporates by reference paragraphs 1 through 59.

61.    Defendants Beckman and Lau, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

  a.    Employed devices, schemes, or artifices to defraud;

  b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

  c.    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including

purchasers of securities.

62.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF

**Violations of Sections 17(a)(1), (2) and (3) of the Securities Act Against Defendant Beckman**

63.    The SEC realleges and incorporates by reference paragraphs 1 through 59.

64.    Defendant Beckman, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails:

      a.   with scienter, employed devices, schemes, or artifices to defraud;

      b.   obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

65.    By reason of the foregoing, Defendant Beckman violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 17(a)(1) and (3) of the Securities Act Against Defendant Lau**

66.    The SEC realleges and incorporates by reference paragraphs 1 through 59.

67.    Defendant Lau, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails:

      a.   with scienter, employed devices, schemes, or artifices to defraud; and

b.   engaged in transactions, practices, or courses of business which operated

or would operate as a fraud or deceit upon purchasers.

68.   By reason of the foregoing, Defendant Lau violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Permanently enjoin Defendants Beckman and Lau from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Permanently enjoin Defendant Beckman from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**III.**

Permanently enjoin Defendant Lau from violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**IV.**

Permanently enjoin Defendants Beckman and Lau from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunctions shall not prevent Beckman or Lau from purchasing or selling securities for their own personal accounts.

**V.**

Permanently bar Defendants Beckman and Lau from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**VI.**

Order Defendants Beckman and Lau to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**VII.**

Order Defendants Beckman and Lau to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VIII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**IX.**

Grant such other and further relief as this Court may deem just and necessary.

Dated:  January 23, 2025                Respectfully submitted,

    */s/ Eli R. Greenstein*

Eli R. Greenstein
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION